DOMENGEAUX, Judge.
This suit was brought by Toce Oil Company (Toce) in order to recover damages incurred due to the drilling of an oil well at the wrong location. Defendant John E. Chance & Associates, Inc. (Chance) was the surveyor that staked both the correct location for the well and the location that was incorrectly drilled. Defendant Central Industries, Inc. (Central) was the boardroad contractor that bid on and prepared the incorrect site for drilling. Liberty Mutual Insurance Company was Central’s liability insurer. After trial on the merits, the district judge rendered judgment in favor of Toce against the defendants and assigned percentages of negligence to all parties concerned. Chance and Central have appealed the trial court’s judgment.
FACTS
In February of 1981 Tom Schiller, Executive Vice-President and Land Manager for Toce, contacted Chance concerning the surveying work at issue in this suit. Schiller spoke with the manager of Chance’s land surveying department and asked him to locate a site and prepare a plat in Section 7 of Township 9 South, Range 7 West, Calca-sieu Parish, in the Gillis-English Bayou Field because Toce’s geologist had proposed the drilling of an oil well at that location. Although the well at issue was to be drilled on property owned by Texaco and leased by Toce, which area was referred to as “J.C. Nickerson Fee”, it is important to note the precise terminology Schiller used in his conversation with Chance’s land survey manager. Significantly, Schiller did not name the fee but told Chance’s land manager to locate a well site in the N/2 of NW/4 of the Section 7. No further designation was made of the well site to be drilled.
Toce’s topographical maps indicated that the proposed site was in a swamp and would be extremely expensive to drill. Schiller therefore asked that Chance locate the proposed site and, if it proved to be in a swamp as suspected, have the surveyor move south toward the road and exercise his discretion in locating and staking an alternate site on more suitable drilling ground. Schiller also informed Chance of a purported Texaco mound in the vicinity and directed that it also be staked if extant.
In accordance with these instructions, Chance sent a field team out to perform the requested survey work on February 17, 1981. The team first confirmed that the *334 proposed well site was deep in the swamp. A stake was placed at that location and labeled with Toce’s name. The trial court held that the stake was labeled “Toce Oil Proposed Location.” Next the survey crew moved south and slightly west approximately 300 feet toward higher ground near the road. A second stake was placed at this site and labeled with Toce’s name and the words “Alternate No. 1.” This location was adjacent to a pipeline and approximately one-half of the well site was in swamp.
The Chance team then proceeded to look for a Texaco mound, as Schiller had directed. Ultimately, they found an area of high ground, large enough to contain the entire drill site. A second alternate stake was placed at this point, approximately 1,200 to 1,400 feet from the primary stake and almost 100 feet off the Nickerson Pee.[1]
The next morning Tom Schiller was apprised of the precise locations of the three stakes and the terrain at each. During this telephone conversation Schiller informed Chance that the Alternate No. 2 stake was not on the Texaco lease on which Toce was planning to drill and directed Chance to “forget” about that location. However, Schiller did not request that Chance remove the Alternate No. 2 stake.
Eventually, Toce made the decision to drill at the Alternate No. 1 location. Desiring to contract out the well site preparation work, Toce contacted Oilfield Construction (Oilfield) and asked them to prepare a written bid on the Alternate No. 1 site and an oral estimate on the originally proposed location in the swamp. Toce gave Oilfield the distance calls for those two locations but did not mention the presence of a third stake (i.e., Alternate No. 2) in the vicinity.
The Oilfield team found all three of the stakes placed by Chance. The location of one of the stakes matched the distance calls supplied by Toce and was labeled “Alternate No. 1”. However, in an abundance of caution, the Oilfield team called its office which contacted Toce to confirm which stake marked the intended site. Oilfield then proceeded to prepare its written bid for the Alternate No. 1 location.
Toce contacted Chance, informed the surveying company of the wellsite selection (Alternate No. 1), and requested the preparation of a state permit plat and an application for a wetland permit from the Corps of Engineers. Chance prepared three additional plats as attachments to that permit, and a fifth plat was later drawn to obtain a Calcasieu Parish permit. All five plats and the permit application were furnished to Toce who then prepared a bid package consisting of the plats prepared by Chance and a sample bid form containing the specifications outlined on the Oilfield bid already received by Toce. This bid package was furnished to three location contractors— Supreme, Soloco, and Central.
Central sent Charles Domingue out to look at the proposed location on April 8th for purposes of preparing its bid. Central had been provided with and was in possession of the plats in the bid package, but only the state permit plat was given to Domingue to take with him to the field. Domingue found the Alternate No. 2 stake but never found either of the other stakes. Domingue testified at trial that he did not consult the state permit plat to see if the information contained therein matched the site he had found. Domingue also testified that he called John Chance’s office and received verification that he had reached the proper location. Chance’s employee denied that such a telephone conversation ever occurred. The trial court resolved this directly conflicting testimony by concluding as a matter of fact “[t]hat no such call was made by Domingue.”
Central submitted two bids for preparation of the Alternate No. 2 drill site to Toce — one for a “dry location” and one for a “wet location with fill.” It was awarded the contract and proceeded to build a *335 boardroad and prepare the drill site at the Alternate No. 2 location, beginning its work on June 10,1981. Contrary to the bid specifications, no pilings seemed to be needed. After a test piling was driven on July 27th, the decision was made by Toce’s representative at the drilling site, Central, and Greywolf (the drilling company), to dispense with the pilings indicated on the bid specifications. Toce was also aware that preparation of the site at the correct location would have required that a nearby pipeline be moved, and its budget for the well included this work as an expense. Central’s preparations, however, entailed no relocation of a pipeline. Central’s location work was completed on July 9, 1981. A Greywolf drilling rig was brought onto the site and drilling began on August 12, 1981.
On September 8, 1981, Mr. Troy Freund, who had an interest in Toce’s drilling activities by virtue of an override on the Nicker-son lease, called Schiller and inquired about the “new” calls for the well and whether an amended permit had been procured. He told Schiller his inquiry was based on his first-hand observation that the well being drilled was not at the location he had seen designated on the permit plat. While Schiller was initially disturbed by Freund’s statements, Schiller dismissed the warning and took no action whatsoever on this information at that time. Drilling was completed on September 17, 1981. During the examination of the second log run on September 17, representatives of Toce determined that the well had been drilled at the wrong location. The well that was mislo-cated at the Alternate No. 2 location was renamed the Louise K. Davis Well.[2] That well was never completed and was temporarily plugged.
The working interest owners of the Nick-erson lease had provided the funds for drilling what ultimately became the Louise K. Davis Well. After the mislocation was discovered, Toce credited the cost of drilling at the incorrect location to the working interest owners and drilled the true Nicker-son No. 1 well at the Alternate No. 1 site with its own funds. Toce filed suit thereafter on December 8,1981, against Chance, Central and Liberty Mutual Insurance Company seeking damages for injury arising from the mislocated well.
After trial on the merits, the trial court rendered judgment in favor of Toce in the amount of $922,617.07 plus interest. This figure represents 87% of the damages claimed by Toce occurring before the September 8,1981 call from Troy Freund. The trial judge’s written reasons for judgment assigned Toce 13% of the negligence contributing to the drilling of the mislocated well, holding that Toce should have been on notice that there was a mistake in location when (1) the physical characteristics of the Alternate No. 1 site, as shown on Toce’s plats, were not present at the drilling site, and (2) the Alternate No. 1 site required a wet land permit which was obviously not necessary at the dry site which was actually drilled. The trial court cast Chance with 55% of the cost of the plaintiff’s damages, and Central and its insurer, Liberty Mutual Insurance Company, with 32%.
I. WAS TOCE THE PROPER PARTY PLAINTIFF TO BRING SUIT TO RECOVER DAMAGES PROPORTIONATE TO THE DEFENDANTS’ FAULT IN CAUSING THE WELL TO BE DRILLED AT THE WRONG LOCATION? ALTERNATIVELY, DID TOCE HAVE A RIGHT OF ACTION TO BRING THIS SUIT?
During trial on the merits, after close of the plaintiff’s case in chief, the defendant-appellants moved for a directed verdict on the grounds that Toce was an improper party. Alternatively, the appellants advanced an exception of no right of action. Both the motion and the exception were overruled by the trial court, and collective *336 ly the appellants submit this ruling as their first assignment of error.
The evidence establishes that the working interest owners of the Nickerson Fee advanced 100% of the funds necessary for the drilling of the Nickerson No. 1 well. The appellants assert that it was the working interest owners' money which was expended to drill the Louise K. Davis well, and therefore, only the working interest owners suffered a pecuniary loss when the well was drilled at the wrong location. Hence, the basis of the appellants’ claim that only the working interest owners have an interest or right in recovering for that loss since Toce did not prove its right of conventional subrogation.
The appellants’ argument is countered by no less than five theories of recovery advanced by Toce, at least two of which support the trial judge’s denial of the appellants’ motion for directed verdict or alternatively, exception of no right of action.
First, the appellants were legally bound to Toce by virtue of their contracts for services rendered. A misperformance of those services entitled Toce (not the working interest owners) to sue for the damages caused thereby. The working interest owners would have had no cause of action to sue for misperformance of those contracts. See the definitive cases of Desormeaux v. Central Industries, Inc., 333 So.2d 431 (La.App. 3rd Cir.1976), writ denied, 337 So.2d 225 (La.1976); and Robins Dry dock & Repair Company v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).
Secondly, if we assume for argument’s sake that the working interest owners were the real parties in interest who suffered the damages incurred by the mislocated drilling, Toce was not required to prove its conventional subrogation because it was legally subrogated to the rights of the working interest owners. At the time of the events giving rise to this suit, the Louisiana Civil Code provided in Article 2161 (now La.C.C. Art. 1829) that subrogation takes place of right “[f]or the benefit of him who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it.”
As the lower court’s judgment makes abundantly clear, Toce, Central, and Chance were all responsible for the well being drilled on the wrong lease. Had the appellants’ argument that the working interest owners were the proper party plaintiffs been correct, it would be obvious that all three parties were the solidary debtors of the working interest owners. Inasmuch as Toce was contractually bound to those investors to drill a well on the Nickerson Fee, Toce paid the debt in full when it credited the monies spent on the wrong well to the drilling of a second well on the Nickerson Fee. In effect, Toce refunded to the working interest owners the damages they incurred in the mislocated drilling.
According to the current La.C.C. Art. 1804, which expresses no change in the law prior to the 1984 obligations revisions (comment a), a solidary obligor who has become subrogated to the rights of the creditor, as described above, has a cause of action against the other obligors for their virile portion which is proportionate to the fault of each obligor. Therefore, if the appellants’ argument that the working interest owners were the real party in interest was correct, Toce would still have a cause of action in subrogation against the appellants for their virile portions.
II. ARE THE APPELLANTS ENTITLED TO THE GRANTING OF THEIR EXCEPTION OF NO CAUSE OF ACTION?
On authority of Louisiana Code of Civil Procedure Article 2163, the appellants have filed a peremptory exception of no cause of action directly to this Court. . The appellants cite us the recent case of PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984) as support for their argument that Louisiana courts have consistently refused to allow recovery against a tort-feasor by a plaintiff who merely had a contractual relationship with the owner of the thing negligently damaged.
The appellants’ stated rule of law is correct, but not applicable to the case at bar. *337 The salient difference between the case at hand and the cases upon which the appellants rely is the relationship between the plaintiff and the owner of the thing damaged. In neither PPG Industries, supra, nor Forcum-James Co. v. Duke Transportation Co., 231 La. 953, 93 So.2d 228 (1957), the leading authority supporting appellants’ rule of law, was the plaintiff sub-rogated to the rights of the owner of the thing. Such is not the case at hand; see the discussion following No. I above, establishing Toce’s legal subrogation to the rights of the working interest owners.
As our Supreme Court noted in footnote 3 of PPG Industries, supra:
“The obvious purpose of the Forcum-James decision was to prevent the tort-feasor from having to pay twice for the same damage, and the court in effect required that suit for the damage to the bridge be filed by either the owner of the bridge or a party subrogated to the rights of the owner.”
Here, by drilling a second well at the correct location and crediting the cost of that drilling to the working interest owners, Toce became legally subrogated to them. That same subrogation protects the appellants from the possibility of double liability. In short, the rule of law emanating from Forcum-James and most recently expressed in PPG Industries, is neither applicable nor desirable under the facts of the present case. Therefore, the appellants’ exception of no cause of action is denied.
III. DID THE TRIAL COURT ERR IN DEFINING THE DUTIES WHICH CHANCE WAS HELD TO HAVE BREACHED?
The trial court held that there were at least two standards of conduct which Chance had breached. First, the trial court found that pursuant to its contract with Toce, Chance had a duty to stake possible drilling sites within the N/2 of the NW/4 of Section 7. This duty was breached when Chance placed the Alternate No. 2 stake approximately 100 feet outside of that defined area. The trial court also found that Chance had breached a second duty to remove the Alternate No. 2 stake once it learned of the mislocation. The trial judge discovered this latter duty in light of the magnitude of harm which could potentially result from the misleading nature of the mislocated stake.
Appellant Chance complains that the trial judge committed an error of law in defining the above duties. However, in its brief Chance fails to argue that it had no duty to confine its survey work within the N/2 of the NW/4 of Section 7. Instead, Chance merely tells this Court that it misunderstood Toce’s directions. Such an assertion does not alter or negate the contractual duty imposed upon this appellant.
Concerning the second duty imposed, Chance argues that the trial court disregarded uncontradicted testimony that field stakes are seldom removed by the surveyor unless requested by the operator. Therefore, Chance maintains it had no duty to remove the mislocated stake in the absence of such a request by Toce. We find the appellant’s argument unpersuasive, notwithstanding Chance’s “uncontradicted testimony”, where that testimony related to stakes which were properly placed on the operator’s lease. The situation presented for our review is dissimilar: Where a surveyor misplaces its stake off of his client’s lease, it is the surveyor’s responsibility, and not that of the client, to remove the potentially misleading marker.
The trial court committed no error in defining the duties of appellant Chance. This assignment is without merit.
IV. WAS THE RISK OF A MISLOCAT-ED WELL WITHIN THE SCOPE OF CHANCE’S DUTIES TO FORBEAR STAKING THE WELL SITE OFF THE OPERATOR’S LEASE AND REMOVE THE STAKE ONCE THE MISLOCATION WAS DISCOVERED? WERE THE ACTS OF CENTRAL AND TOCE INTERVENING AND SUPERSEDING CAUSES OF THE PLAINTIFF’S DAMAGES SO AS TO ABSOLVE CHANCE OF ALL LIABILITY?
Chance has framed essentially the same issue in two languages — that of the duty- *338 risk analysis and in proximate cause terminology. Both questions entreat this Court to conclude that Chance’s substandard conduct, while admittedly a cause-in-fact of Toce’s damages, was not a legal cause of the harm befalling the plaintiff.
We agree with the Court below that the duties of the surveyor to stake within the articulated bounds of his client-operator’s lease and to remove any stakes mistakenly located off the lease encompasses the very real risk that the negligence of a subsequent party would combine with that of the surveyor to produce a well that was off the operator’s lease. The mere fact that the negligence of a third party was also a necessary factor in causing the plaintiff’s harm does not discharge Chance from its burden of liability.
V. DID TOCE ASSUME THE RISKS IMPOSED BY THE NONREMO-VAL OF THE ALTERNATE NO. 2 STAKE?
It is unnecessary for this Court to delve too deeply into the merits of this assignment of error by appellant Chance because it is not properly before us for review. La.C.C.P. Art. 1003 mandates that a defendant’s answer specifically plead all affirmative defenses. La.C.C.P. Art. 1005 states that the answer “shall set forth affirmatively ... assumption of the risk_” In the present case this requirement was not met, nor were the facts constituting such a defense included in any of Chance’s various and amended answers. Under the circumstances we cannot consider the defense. McBride v. Lyles, 303 So.2d 795 (La.App. 3rd Cir.1974).
VI. WAS THE TRIAL COURT MANIFESTLY ERRONEOUS IN ASSIGNING 55% NEGLIGENCE TO CHANCE?
Finally, Chance complains that the finding of 55% negligence is manifestly erroneous in view of the extreme negligence of Central in preparing the incorrect well site upon completely accurate information supplied by Chance, and considering the various negligent acts and omissions of Toce.
Appellant Chance is well aware that our review of factual determinations by the trial court is limited to the standard of Canter v. Koehring, 283 So.2d 716 (La. 1973), and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), and their progeny. Even where our allocation of negligence percentages would differ from that of the trial court, we are constrained to affirm the judgment absent a determination that the trial court was clearly wrong. Arceneaux, supra.
In the voluminous record before us we see sufficient justification for the trial court’s allocation of 55% negligence to appellant Chance. Further, while the record could support a greater percentage of negligence attributable to Central and Toce, the respective 32% and 13% negligence imposed by the trial court is not clearly wrong. Therefore, this assignment is also without merit.
VII.WERE CENTRAL’S ACTS OF LOCATING AND PREPARING THE INCORRECT DRILLING SITE A CAUSE-IN-FACT OF TOCE’S DAMAGES?
The boardroad contractor alleges the trial court erred in finding Central’s acts to be a cause-in-fact of the mislocated well. The distinguished professor Malone clearly defined an act constituting a cause-in-fact of the plaintiff’s damages:
“This item of behavior must be regarded as a cause-in-fact of the harm suffered by the victim whenever the trier concludes that the same harm would probably not have occurred if the defendant had not engaged in the conduct with which he is charged. A cause-in-fact can thus be defined as a necessary antecedent, and the process of determining the existence or non-existence of cause is essentially one in which the trier speculates as to what would have happened if the conduct in question had not taken place ...
[[Image here]]
*339 If the victim would probably not have encountered the harm but for the defendant’s conduct, it can be concluded that such conduct was a cause in fact and that the victim has sustained the required burden of proof on that issue.”
Malone, “Ruminations on Dixie Drive It Yourself versus American Beverage Company”, 30 La.KRev. 363, 370 (1970).
In the instant ease it is obvious Toce would probably not have suffered the drilling of the Louise K. Davis well had Central properly located and prepared the intended drill site. This assignment lacks merit.
VIII.DID CENTRAL OWE A DUTY TO TOCE WHICH WOULD PROTECT TOCE FROM THE RISK OF A MISLOCATED WELL?
In this assignment, Central questions the existence of an applicable rule of law which would protect the plaintiff from the particular hazard encountered. The trial court held that Central owed Toce the duty of locating and preparing a well site for which proper coordinates and plats were supplied. The lower court additionally concluded that such a duty extended to encompass the risk that Toce’s well may have been drilled at the wrong location.
Central advances six so-called socioeconomic considerations[3] which allegedly weigh against a decision that Central owed Toce a legal duty not to create this specific risk of harm by the conduct which we have already concluded was a cause-in-fact of the plaintiff’s damages. We need not explore each of these six factors: Suffice it to say that the possibility of a mislocated well resulting from the defendant’s failure to locate the proper well site is immediately apparent to us as it was to the trial court. Further, we cannot say that the magnitude of harm flowing from Central’s conduct is outweighed by the nonexistent utility of that conduct. This assignment, also, is without merit.
IX. SHOULD TOCE BE BARRED FROM RECOVERING IN CONTRACT FROM CENTRAL?
In this appeal Central has asked us to reverse the trial court and hold that Central is not liable to Toce in tort. Anticipating that we would hold in its favor, Central also seeks to avoid liability in contract. Basically Central argues that since Toce accepted Central’s work in spite of obvious defects, Toce is barred from recovering damages arising from those defects. Inasmuch as we affirm the trial court’s holding that Central is liable to Toce in tort, we have no need to address the merits of this issue.
X. SHOULD MITIGATION OF DAMAGES PRECEPTS APPLY TO BAR TOCE’S RECOVERY?
Finally, Central claims that Toce had a duty to mitigate its damages by discovering the mislocation and preventing drilling at the incorrect site. The appellee counters by maintaining it could not mitigate damages of which it was not aware.
There was much testimony adduced at trial concerning when Toce should have become aware of the mislocation of the drilling site. Starting with widely varying bids from the different site preparation companies, Toce was in receipt of information which could have led to discovery of the mislocation. However, the court impliedly held that the date of Troy Freund’s phone call to Schiller marked the point in time at which any reasonable person should have been put on notice of the mislocation. Having reviewed the record, we find no manifest error in this determination. Arceneaux v. Domingue, supra.
Toce’s failure to recognize and deal with the error in location subsequent to Troy Freund’s phone call of September 8, 1981, has been adequately addressed by the trial court — no damages were awarded for inju *340 ry arising from that point forward. Further, since we have found no error in the trial court’s determination of when Toce should have become aware of the mislocation, we fail to see how Toce could have mitigated its damages before it knew or should have known of the mistake. Therefore, this last assignment is also without merit.
For the above and foregoing reasons, the judgment of the district court is affirmed, and the appellants’ exception of no cause of action is denied. All costs of this appeal are to be assessed one-half to appellant Chance & Associates, Inc., and one-half to appellant Central Industries, Inc.
AFFIRMED.

. The trial judge made no finding concerning the wording on the second alternate stake, other than to note it was labeled with Toce Oil’s name. Further, we find the evidence is inconclusive on this issue. For clarification we will henceforth use the phrase "Alternate No. 2" to designate the site which was off fee and ultimately incorrectly drilled.

. Henceforth, we will refer to the well drilled on the Alternate No. 2 site as the Louise K. Davis Well.

. These six factors are: (1) ease of association, (2) administrative considerations, (3) economic considerations, (4) moral considerations, (5) type of activity, and (6) precedent or historical considerations. McNamara, “The Duties and Risks of the Duty-Risk Analysis”, 44 La.L.Rev. 1227, 1234 (1984).